487 So.2d 951 (1984)
Anthony BURTON
v.
STATE.
5 Div. 878.
Court of Criminal Appeals of Alabama.
November 13, 1984.
On Rehearing February 12, 1985.
On Return to Remand December 10, 1985.
Rehearing Denied April 22, 1986.
*952 Terry G. Davis, Montgomery, for appellant.
Charles A. Graddick, Atty. Gen., and Jane LeCroy Brannon, Asst. Atty. Gen., for appellee.
LEIGH M. CLARK, Retired Circuit Judge.
This is an appeal from a judgment of conviction and sentence in a trial against this appellant only on an indictment charging that this appellant and Clarence Burton:
"... Did in the course of committing a theft of ninety dollars ($90.00), ... the property of Lonnie Hooks ... use force against the person of Lonnie Hooks, with intent to overcome his physical power of resistance, while the said Clarence Burton and Anthony Burton were armed with a deadly weapon, to-wit: a pistol, in *953 violation of Section 13A-8-41 of the Code of Alabama...."
The only eyewitnesses as to the alleged crime were the alleged victim and Ms. Ida Mae Kit.
According to the testimony of the alleged victim, he was at his home at Shorter, Alabama, on February 20, 1982, at about 6:00 P.M. when Ida Mae Kit came by and asked to use his telephone to report the fact that the automobile she was in had broken down and that, "we want to use the telephone and make a telephone call for somebody to come pick us up." He said that he then "let her on in" and that when he did so, "Anthony Burton and Clarence Burton come in." He further testified that "Anthony throwed his gun on me and said where is the money?" His testimony continued in part as follows:
"Q. What happened next?
"A. So Clarence he said where is the money. He said you got a wallet? You know you got one. He pulled his gun out.
"Q. So both of them had guns?
"A. Both had guns. And it come to me where my wallet was. It was in my coat pocket in my truck. So I told him where it was. And Clarence said go get it. He said no, don't you go get nothing. You stay here. He caught hold of me.
"....
"Q. Anthony went and got the wallet?
"A. He got the wallet and brought it back and handed it to Clarence. And Clarence got the money out. And that time
"Q. About how much money was in your wallet?
"A. The best I could count was $90."
According to further testimony of the victim, the indictees tied him up and took him into his bedroom where they burned his feet and told him that if he did not have more money when they came back he would be killed. They ransacked his house before they left. He was found by his cousin some time after midnight and then called the police and reported that he had been robbed.
We deem it appropriate to accept the summary of the testimony of Ida Mae Kit that is contained in appellant's brief and quote therefrom as follows:
"Ms. Kit testified that on February 20, 1982, Anthony Burton and Clarence Burton came to her house. She stated that Clarence and Anthony were cousins. They told her that they wanted her to go with them to Mr. Hooks' house. When they arrived at Mr. Hooks' house she knocked on the door and told him that she would like to come in to use the phone because she was having car trouble. Anthony and Clarence came into the house with her when Mr. Hooks let them in. She testified that she tried to use the phone and that it was busy when she picked it up because they have a party line. After a few minutes Anthony pulled a gun on Mr. Hooks. He told Mr. Hooks to give him his money. Clarence had his gun out also. Mr. Hooks told them that his wallet was outside in the truck. Anthony went outside and got a coat out of the truck. The wallet was in the coat and contained ninety dollars. After Anthony came back into the house, he pushed Mr. Hooks onto the bed and he and Clarence taped his arms and legs behind his back.
"Ms. Kit further testified that Anthony and Clarence weren't satisfied with the amount of money they had and started pulling out the chest-of-drawers in his bedroom and looking in the kitchen for more money. After they couldn't find any more money, one of them got a fire started with some paper and began to burn Mr. Hooks' feet. Clarence snatched the phone out of the wall and Anthony fired shots into the floor. Clarence told Mr. Hooks that he'd better have more money the next time they came back.
"Ms. Kit stated that several days after the incident she talked with a deputy from the Macon County Sheriff's Department. She told them what happened and *954 gave them the names of the persons involved.
"On cross-examination Ms. Kit testified that she is related to Ms. Hooks. She stated that it was not her plan but she did help them to get into his house. She did not go home that night and stayed with Clarence and Anthony. She did not receive any of the money.
"Ms. Kit further testified that she was not indicted or arrested even though she participated in the crime."

I.
The following is the first issue presented in appellant's brief:
"WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN REFUSING TO ALLOW APPELLANT TO CROSS-EXAMINE DEPUTY SHERIFF ON DEPARTMENT POLICY CONCERNING TREATMENT OF ACCOMPLICES."
The issue is directed at a ruling of the trial court sustaining the State's objection to the last question asked by defendant's attorney on cross-examination of the State's witness Major Wardel Pearson, a deputy sheriff of the Macon County Sheriff's Department, who had testified that in his official capacity he responded to the call on the morning of February 21, 1982, to go to the residence of Lonnie Hooks. He testified:
"When I walked in the front door of the trailer there the living room was all ransacked. The trunk was open and some clothes were scattered all about in the living room. Then I proceeded to the bedroom where Mr. Lonnie Hooks was. He was lying on the bed. He had a piece of tape, duct tape, across his eyes, his hands were tied with tape. His feet was tied with tape.
"Q. What did you do then?
"A. I took the tape off his feet and his hands. And his son Vandervile he took it off his eyes.
"Q. Did Mr. Hooks make a complaint to you at that time, Mr. Lonnie Hooks?
"A. He did.
"Q. What complaint did he make to you?
"A. He advised me that he had been robbed by two black males that at the present time that he didn't know who they were. Also a lady was involved. And he said that he didn't know her name, but she was supposed to be related to him. He knew her mother.
"....
"Q. Now, at some time later were you given the name of anyone of the people involved?
"A. Yes, I was.
"Q. And who gave you the name?
"A. Ida Kit.
"Q. Who gave you her name?
"A. Ida Kit gave me the names.
"Q. How were you directed to Ida Kit?
"A. Well, after Mr. Hooks told me that this Idaat that time he didn't know her mother's name, I went to her mother and asked to speak to Ida.
"....
"Q. What did you ask Ida Kit?
"A. Well, I first advised her of her rights. Then I asked her was she at Mr. Lonnie Hooks' house on the morning of well, that afternoon of the 20th around 6:00. She advised me she was.
"Q. Did she give you the names of the other people that were involved?
"A. Yes, she did.
"Q. Did you have to force her to give you those names?
"MR. THOMPSON [Defendant's attorney]: We object to leading the witness, Your Honor, suggesting the answer.
"THE COURT: Sustained.
"Q. Did you have to threaten her to give you the names of the other people involved?
"MR. THOMPSON: Object, leading the witness.
"THE COURT: Sustained.
"Q. Did she cooperate with you in telling you exactly what happened on that night?
"MR. THOMPSON: Your Honor, I would object.

*955 "MR. JONES [Attorney for the State]: Your Honor, I have no more questions.
"THE COURT: Counsel, I sustain two objections in a row to patently leading questions and you deliberately continued. And I'll admonish you not to do that again as a trial tactic or any other tactic in my courtroom.
"MR. JONES: Yes, sir, Your Honor.
"BY MR. JONES:
"Q. Was Ida Kit charged with robbery in this case after the conversation that you had with her?
"A. No, she was not."
Defendant's cross-examination of Major Pearson was brief, and we quote it in its entirety:
"Q. Major Pearson.
"A. Yes, sir.
"Q. Did Ida Kit turn herself in to you?
"A. No, sir.
"Q. Did she call you on the phone to come talk to her?
"A. No, she didn't.
"Q. You got to her only because Mr. Hooks gave you sufficient information to locate her?
"A. Yes.
"Q. And was Mr. Clarence Burton arrested?
"A. No, he wasn't.
"Q. Was Ida Kit arrested?
"A. No, she wasn't.
"Q. She was never placed under arrest?
"A. Not by me.
"Q. Just what you know. Is it the practice of the police department to let participants in robberies go?
"A. Police Department?
"Q. I mean the Sheriff's Department.
"MR. JONES: I object.
"THE COURT: Sustained.
"MR. THOMPSON: No further questions."
The State's redirect examination of the witness, consisted of only two questions and answers, as follows:
"Q. Why was Clarence not arrested?
"A. He skipped the city. We never did catch up with him.
"Q. He skipped town?
"A. Yes, sir."
No further testimony was presented by either party after the two questions and answers last quoted.
In his argument in support of the first issue presented in appellant's brief, his attorney relies upon the "right of cross-examination, thorough and sifting" that is guaranteed "to every party as to the witnesses called against him" by Code of Alabama, § 12-21-137. He relies heavily upon the following from Green v. State, 258 Ala. 471, 474-5, 64 So.2d 84 (1953):
"It is always competent on cross-examination to make such interrogation of a witness as would tend to test his interest, bias or prejudice or to illustrate or impeach the accuracy of his testimony. Both our appellate courts have approved of the principle stated in 2 Wigmore on Evidence, 2d Ed., § 949, p. 332: `The range of external circumstances from which probable bias may be inferred is infinite. Too much refinement in analyzing their probable effect is out of place.' [Citations omitted.]
"And the extent to which a witness may be cross-examined depends in some instances on the importance of his testimony...."
We think that what was said by Justice Simpson in that part of the opinion of the Alabama Supreme Court in Green v. State, supra, immediately after the last sentence quoted above, is of tremendous value in our quest for a correct decision as to appellant's first issue. We now continue to quote from what Justice Simpson stated:
"In Louisville & N.R. Co. v. Martin, supra, [240 Ala. 124, 198 So. 141, 144 (1940)] this court quoted with approval the following pertinent statement of principle from the note in 74 A.L.R. 1154:
"`... A witness may be testifying in reference to matters peculiarly within his knowledge, and as to which contradiction is difficult, where the turn of a phrase may control the disposition of a *956 case. In such instances, it is submitted, a very searching inquiry as to circumstances indicating the existence of intellectual bias, or of emotional hostility, should be allowed ...'
"....
"The cross-examination of the two McGough witnesses is governed by these principles. Their testimony was the most damaging given against the defendant. The evidence to connect the defendant with the crime was entirely circumstantial and it was their testimony more than any other which tended to this effect. They were the last ones who saw him on the afternoon of the night the murder was committed. It was they who stated he was in possession of the stick, identified by them as the one later found at the home of the deceased, when he separated from them going up the trail to the home of the deceased. In contradiction of this and as tending to cast suspicion on these two witnesses, the defendant testified he left the stick at the McGoughs' when he left going to his home and that on leaving them the McGoughs stated they were going up to Mrs. Boshell's and the younger McGough, after testifying he and defendant went to the deceased's home and then left, after which he saw defendant no more that day, admitted he went back up to the deceased's where he remained for a considerable time and did not reach his home, about three-quarters of a mile distance, until long after dark."
We are confident that there was good reason for calling Major Pearson as a witness for the State, but we do not look upon his testimony as important when compared to the testimony of the two eyewitnesses. Appellant argues, "The importance of the Sheriff's Department policy as to how it treats accomplices is obviously important and clearly relevant in that it could directly establish bias, interest or even the compelling reason why Ida Mae Kit chose to testify against the appellant." This, however, would have no tendency to "establish bias, interest or even the compelling reason" why Major Pearson testified in the case. We do not fully understand why he was called upon to testify, as he added very little, if anything, to the weight of the evidence against defendant. Whether it would be helpful for us to know the reason for the State's calling Major Pearson as a witness, the defendant's reason for asking Major Pearson whether it was the practice of the "Sheriff's Department" to let "participants in robberies go," or the reason for the court's sustention of the objection to such question, we are unable to determine. Nevertheless, we are convinced that the sustention of the State's objection to the question asked Major Pearson as to whether it was "the practice of the Sheriff's Department to let participants in robberies go," was not an infringement upon defendant's right to thorough and sifting cross-examination and did not constitute error prejudicial to defendant. As stated recently by the late Judge Barron in Coburn v. State, Ala.Cr.App., 424 So.2d 665, 669 (1982), cert. denied, Ala. (1983):
"The scope of cross-examination in a criminal proceeding is within the discretion of the trial court, and it is not reviewable except for the trial judge's prejudicial abuse of discretion. The right to a thorough and sifting cross-examination of a witness does not extend to matters that are collateral or immaterial and the trial judge is within his discretion in limiting questions which are of that nature. Collins v. State, supra, [Ala.Cr.App., 364 So.2d 368 (1978).]"
That we should refrain from undue constriction of the trial court's discretion by holding that it was abused as to the matter under consideration is emphasized by the fact, as stated above, that the transcript does not expressly set forth the reason on the part of the defendant's attorney for asking the particular question, the reason on the part of State's attorney for objecting to the particular question, or the reason on the part of the trial judge for sustaining the objection. If the trial judge was not enlightened as to the first two, he certainly was as to the third, his own reason, in ruling as he did. We should not presume *957 that he had no good reason for sustaining the objection, and we conclude that the ruling did not constitute error prejudicial to defendant.

II.
By the second issue presented in the brief of counsel for appellant, appellant contends that the trial court erred "in failing to order that the appellant be credited with all time served pending trial and sentencing." In support of this contention, appellant relies upon Code of Alabama 1975, § 15-18-5, as follows:
"Upon conviction and imprisonment for any felony or misdemeanor, the sentencing court shall order that the convicted person be credited with all of his actual time spent incarcerated pending trial for such offense. The actual time spent incarcerated pending trial shall be certified by the circuit clerk or district clerk on forms to be prescribed by the board of corrections."
Appellant further contends that the mandatory requirements of this Code section were specifically upheld in the recent case of Blake v. State, 462 So.2d 948 (Ala. Cr.App.1984), in which there was a dissenting opinion and which case, at the time of the commencement of this part of this proposed opinion by the writer, was pending in the Alabama Supreme Court on certiorari. However, we have since had the benefit of the decision by the Alabama Supreme Court in the Blake case on August 31, 1984, and proceed in accordance therewith:
"This cause is remanded to the Court of Criminal Appeals for an order remanding the case to the Montgomery Circuit Court [the trial court] with instructions for that court to determine the incarceration time, if any, served by the Defendant incident to the instant criminal offense prior to his conviction and sentence, and to correct the sentence previously pronounced accordingly, if so indicated by this determination."

III.
The third issue presented by appellant is thus stated in appellant's brief:
"THE TRIAL COURT ERRONEOUSLY DENIED APPELLANT'S MOTION FOR BOND AND IMPROPERLY SENTENCED HIM WITHOUT APPRISING HIM OF THE PROBABLE MINIMUM AND MAXIMUM SENTENCE HE COULD RECEIVE FOR HIS CONVICTION."
According to Criminal Code § 13A-8-41(c), robbery in the first degree is a Class A felony, which according to § 13A-5-6(a)(1) is punishable by imprisonment "for life or not more than 99 years or less than 10 years."
Promptly after the return of the verdict by the jury and the affirmative response by each of them to the polling of them by the trial judge, the following occurred:
"THE COURT: Let the record show that all 12 jurors responded in the affirmative that this is their verdict. Do you wish a sentencing hearing?
"MR. THOMPSON [Defendant's attorney]: Yes, sir.
"THE COURT: OK. Sentencing in this case is set for the 13th day of October at 9:00. I will ask that the probation office prepare a pre-sentence report. You will be permitted to submit whatever evidence you wish to present in connection with the pre-sentencing hearing. I'll tell you at this time since this is a conviction which carries a prison term for 20 years or more the defendant is now allowed will not be allowed to go at bail, and no bond will be set at this time. And the defendant will be committed to the custody of the Sheriff's Office of Macon County pending sentencing. Any further proceedings, gentlemen?
"(WHEREUPON, THE FOLLOWING BENCH CONFERENCE HELD OUT OF THE HEARING OF THE JURY.)"
It is apparent from that which has been quoted above that the trial court was mistaken as to the minimum sentence that could be legally imposed upon defendant.
*958 Instead of its being twenty years as stated by the trial court, it is ten years.
It appears that appellant makes no contention that any prejudicial error has arisen by reason of his not being permitted to make bond, if he could, on appeal. His position is that the trial court's mistake in saying that the minimum punishment in the case was twenty years instead of ten years could have influenced, or did influence, the trial court to sentence defendant to imprisonment for fifty years instead of some fewer years. We cannot say with certainty that such contention by appellant is correct; on the other hand, we cannot say with certainty that it is incorrect. We would be somewhat persuaded in favor of appellant on the point by reason of the development on the sentencing hearing that the instant case was the first time in which defendant had been involved in criminal activity and defendant's statement on the sentence hearing, "... and this is my first time involved in a crime. And I don't feel that I am no threat to society," was not seriously challenged. On the other hand, we cannot say with assurance that if the trial court had known that the minimum sentence provided by law was ten years' imprisonment, the sentence would have been any less than what it was, in the light of what the trial court said, as follows:
"The court takes into consideration the nature of the offense primarily in connection with the sentence. The court has determined the evidence in this case was that you were in on an elderly man in his house, home, at night time and with your companions with a gun and ransacked the man's house, tortured him, burned his feet in an effort to have him tell where more money was, and told him that you were going to kill him if he didn't have more money the next time you came. Without any hesitation I sentence you to 50 years in the penitentiary of the State of Alabama."
We endeavor to make it clear that it is not for this court to determine the appropriate punishment within the maximum and minimum limits fixed by the legislature, which function is, as it should be, that of the trial court. Nevertheless, we need to be persuaded as to whether in fixing the defendant's punishment the trial court was influenced by the mistaken notion that the minimum sentence for the crime committed was twenty years instead of ten years. To resolve that question, we deem it appropriate to remand the cause with directions that the trial judge conduct another sentencing hearing at which the question that now concerns us will be clarified and that the parties with their respective attorneys be present. We give no directions as to the scope of such hearing other than that it be sufficient to afford an answer to the question that now concerns us as stated. A return to the remandment will be made in due course with notice to the parties. Either party aggrieved thereby will have fourteen days within which to file a brief and the opposing party seven days thereafter within which to file a reply brief.

IV.
Appellant states as his fourth issue the following:
"THE TRIAL COURT SENTENCED APPELLANT TO AN UNDULY HARSH SENTENCE FOR EXERCISING HIS RIGHT TO A JURY TRIAL AND MAINTAINING HIS INNOCENCE THROUGHOUT THE TRIAL."
Appellant's argument as to this issue is premised largely upon the following statement of the trial court during the sentencing hearing:
"At this time, for the record, I want the record to show that I received in the mail this week a letter from this defendant which is postmarked October 10th 1983. And preserved the envelope as well. Throughout the trial of the case the defendant maintained his innocence. The letter which he has written to me isI'll not characterize it. It speaks for itself. But certainly indicates that the defendant did, in fact, participate in the alleged offense. At this time I will ask if there *959 is anything you wish to say before the court passes sentence?"
Appellant continues his argument in his brief by asserting "that the record supports the finding that the trial court considered negatively and vindictively that the admission of the appellant came only after appellant had exercised his right to be tried by a jury and `maintained his innocence throughout the trial.'" Appellant attempts to buttress his argument with Pelmer v. State, Ala.Cr.App., 389 So.2d 584 (1980), in which Judge Tyson, with characteristic thoroughness and logic, recognized the right of an appellant to challenge successfully the imposition of a "disparate" sentence (one in the particular case much greater than one proposed during a plea bargaining effort), if "the trial judge had some vindictive motive in sentencing a defendant to an enhanced term." We continue to hold as we did in Pelmer v. State, supra, that there was no vindictiveness or improper motive by the trial judge in sentencing defendant to imprisonment for the term stated in the judgment of sentence.

V.
Appellant next contends in his brief that "the trial court committed reversible error in refusing to charge the jury on lesser included offenses of robbery." He particularizes in his brief that "the trial court erred when it failed to charge the jury on the lesser included offense of assault" in the first degree as defined by Alabama Criminal Code § 13A-6-20 and classified thereby as a "Class B felony." In support of the contention, appellant relies upon Ex Parte McGee, Ala., 383 So.2d 205 (1980), which we are pleased to follow with extraordinary care, and wherein it was stated at 383 So.2d 206:
"The petitioner presented evidence that he believed the dollar he forcibly took from Mr. Gray belonged to him. That evidence entitled him to an instruction on the lesser included offense of assault, because if the jury believed that the petitioner lacked a specific felonious or larcenous intent to steal, he could not be found guilty of robbery but only of the lesser included offense of assault. The defendant has the right to request instructions based upon any material hypothesis which the evidence in his favor tends to establish. Johnson v. State, 257 Ala. 644, 60 So.2d 818 (1952). In determining whether an instruction was supported by the evidence the question is not whether the Supreme Court or Court of Criminal Appeals believes the evidence, but simply whether such evidence was presented. Hunter v. State, supra [295 Ala. 180, 325 So.2d 921 (1975)]; Giles v. State, 366 So.2d 351 (Ala.Cr.App. 1978)...."
The facts in the instant case are clearly distinguishable from those in Ex Parte McGee in that no evidence was "presented" in the instant case that the property defendant took from the alleged victim "belonged" to defendant and there was no evidence in the case indicating any absence of an intent to steal on the part of defendant. The evidence is subject to no reasonable construction that defendant committed an assault in the first degree upon the alleged victim but that he did so without any intent to steal.
It is also to be observed that defendant made no written request for the court to charge the jury on any lesser included offense.
The transcript shows that defendant's attorney introduced the question as to whether the court should charge the jury on lesser included offenses while the jury was in recess soon after the close of the evidence and before arguments of the attorneys for the respective parties commenced, at which time the following occurred:
"MR. THOMPSON [Defendant's attorney]: I would ask for a lesser included.
"THE COURT: I will not give a charge on any lesser included offense. There would be no basis in the evidence for a lesser included charge. He is either guilty of robbery in the first degree or he's guilty of nothing.
"MR THOMPSON: May the record reflect that defense takes exception to the court refusing to instruct the jury.

*960 "THE COURT: You will need to do it after the charge. But there simply would be no basis.
"MR. THOMPSON: Burglary.
"THE COURT: Burglary is not even a lesser included offense."
Thereafter, the conference at the Bench, out of the presence and hearing of the jury, was for about a couple of pages of the transcript between the trial judge and State's attorney exclusively. When the trial court concluded such conversation, the following occurred:
"MR. THOMPSON [Defendant's attorney]: No lesser included?
"THE COURT: No lesser included."
Toward the close of the oral charge of the court to the jury, another bench conference was conducted out of the hearing of the jury, at which the following occurred:
"MR. JONES: The state is satisfied.
"MR. THOMPSON: We take exception for the record of the court's failure to instruct the jury on the lesser charge of robbery.
"THE COURT: Anything else?
"MR. THOMPSON: No, sir."
We have endeavored to show hereinabove all that took place with reference to whether the court should have instructed the jury as to any lesser included offense. In our opinion, the trial judge analyzed the evidence and the law correctly in concluding and instructing the jury that whatever verdict it returned should be either: one finding defendant guilty of robbery in the first degree, or one finding him not guilty. It is also our opinion that the failure of defendant to request in writing a specific instruction as to any lesser included offense of assault precludes a finding by us that the trial court committed reversible error in not charging the jury as to any lesser included offense.

VI.
As a final contention for a reversal, appellant asserts that comments by the prosecuting attorney during closing arguments were so "grossly improper that the resulting prejudice was ineradicable." The targets of the contention are the following portions of the closing argument of counsel for the State:
"MR. JONES: I think all of you understand that the only crime more serious than robbery is murder. Because in murder
"MR. THOMPSON: Your Honor, I would object.
"THE COURT: Sustain the objection.
"....
"MR. JONES: They say you can't believe Mr. Hooks because he's an old man and can't see. This is not the first case I've tried, ladies and gentlemen of the jury. Don't you think I know that. Don't you think that I knew that.
"MR. THOMPSON: We object.
"THE COURT: Sustained."
Whatever prejudice to the defendant may have been caused by any of the argument just quoted, it was not ineradicable. The sustention of defendant's objection in each instance had a natural tendency to remove any prejudice. Defendant invoked no further ruling of the court as to either of the quoted portions of the argument of counsel for the State. In our opinion, appellant's sixth contention for a reversal is without merit.
Upon consideration of all issues presented by appellant, we are of the opinion that there has been no error prejudicial to defendant as to the verdict and judgment finding him guilty of robbery in the first degree as charged in the indictment and as proscribed by Alabama Criminal Code, § 13A-8-41, and the judgment of conviction should be affirmed. However, we are of the opinion, as indicated in our discussion above of Issue II, that the case should be remanded to the trial court with instructions that the court determine the incarceration time, if any, served by the defendant in the instant case prior to his conviction and sentence, and to correct the sentence previously pronounced accordingly, if so indicated by the determination. We are also of the opinion, as set forth in our discussion of Issue III, that the cause *961 should be remanded to the trial court with directions that it conduct another sentencing hearing in order to clarify the question presented by Issue III.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
REMANDED WITH INSTRUCTIONS AS TO CREDITING DEFENDANT WITH ANY INCARCERATION TIME PENDING TRIAL AND WITH DIRECTIONS FOR ANOTHER SENTENCING HEARING.
All the Judges concur.

ON REHEARING
LEIGH M. CLARK, Retired Circuit Judge.
By appellee's application for rehearing and its brief and argument in support thereof, it has been brought to our attention that the writer of the opinion on original submission was incorrect in his conclusion that the trial court could have properly sentenced defendant to imprisonment, as provided for punishment for a Class A felony by Alabama Criminal Code § 13A-5-6(a)(1). The writer apparently overlooked § 13A-5-6(a)(4), which provides for a sentence of "not less than 20 years" for a Class A felony in which a firearm or deadly weapon was used or attempted to be used in the commission of the felony. Therefore, a portion of the opinion on original submission is hereby modified so as to remand this cause for resentencing for the purpose only of the trial court's determination of whether the defendant is entitled to credit for time previously served, and if so, to what extent.
APPLICATION FOR REHEARING GRANTED BY MODIFYING THE SCOPE OF THE ORDER REMANDING THE CAUSE FOR ANOTHER SENTENCE HEARING.
All the Judges concur.

ON RETURN TO REMAND
LEIGH M. CLARK, Retired Circuit Judge.
We have received as of August 30, 1985, the trial court's Return to Remand enclosing the court reporter's transcript of the hearing conducted by the trial court in intentional pursuance of the order of this Court, as modified on rehearing, remanding the cause to the trial court for another sentence hearing, which Return discloses that the hearing was conducted by "Teleconference" engaged in among the trial judge, the defendant, defendant's counsel, an Assistant District Attorney, the appropriate probation officer and the court reporter, which was concluded as follows:
"THE COURT: Well, this ends
"THE DEFENDANT: One thing, Your Honorwhen will I know how much jail credit I have, or will you tell me now how much I have?
"THE COURT: I don't believe that I can give you the exact time that you have. But I'll put it like this: You said seventy days that you were aware of. It will not be less than seventy days. And such in the record, if we find that it's any more than that, we'll give you the full amount. But I'll take your word at this point for the fact that you've served seventy days. And we'll give you credit for seventy days and whatever. If it's found that there is more than seventy days that you are entitled to, we will give you credit for that also. But that will be a matter of record. And it will beyour transcript will be amended and forwarded. And we'll sendwe'll notify your attorney, and he can get in touch with you about it if it's not in addition to seventy days. Is that satisfactory?
"THE DEFENDANT: Well, I don't guess I have much of a choice.
"THE COURT: What other choice would you like, Mr. Burton?

*962 "THE DEFENDANT: I don't guess I have much of a choice. I would like to know exactly how much I have. That's why I called this conference.
"MR. DAVIS: [Defendant's Attorney]: I will find out the exact amount as soon as I'm notified by the Court. I will be in touch with you.
"THE DEFENDANT: Yes, sir.
"THE COURT: Anything further? Okay. Then we'll end this hearing then. And I appreciate all of you participating."
We have received nothing further from anyone since the filing of the return to remand on August 30, 1985. It follows that the judgment of sentence, as well as the judgment of conviction, should now be affirmed.
OPINION EXTENDED; AFFIRMED.
All the Judges concur.